# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3805-24

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

E.Z.-V.,

      Defendant,

and

J.A.,

      Defendant-Appellant.

_____

IN THE MATTER OF J.A.
and J.Z.-V., minors.[1]

_____

Submitted May 11, 2026 – Decided July 2, 2026

Before Judges Walcott-Henderson and Bergman.

---

[1] We use initials to protect the identity and privacy of the children. R. 1:38-3(d)(10) to (12).

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FN-09-0115-24.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Eric Storjohann, Assistant Deputy Public Defender, on the briefs).

Jennifer Davenport, Attorney General, attorney for respondent, (Deborah E. Wassel, Assistant Attorney General, of counsel; Alicia Y. Bergman, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollack, Deputy Public Defender, of counsel; Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant J.A. appeals from two orders issued by the Family Part: a June 18, 2025 order terminating litigation, and a September 20, 2024 order entered following a Title Nine fact-finding hearing that resulted in a determination he abused or neglected his then-six-month-old son, J.Z.-V. The finding was based on evidence that J.Z.-V. sustained a fracture while under J.A.'s care, which the Division of Child Protection and Permanency's (the Division) medical expert opined was consistent with an injury inflicted on a non-ambulatory infant. Before us, J.A. argues solely that he was denied the effective assistance of counsel at the fact-finding hearing because trial counsel failed to adequately

prepare and present the testimony of his medical expert to rebut the State's theory of medical causation.[2]  Having carefully reviewed the record, we affirm.

## I.

We briefly recount the facts adduced at the fact-finding hearing to provide context for our analysis, with particular emphasis on the testimony of J.A.'s medical expert, Dr. Jack Levenbrown, which underlies J.A.'s ineffective assistance of counsel claim.

At the time of the events giving rise to this litigation, J.Z.-V. was approximately six-months-old and not yet ambulatory.  J.Z.-V. resided with his mother, E.Z.-V., father, J.A., and older half-brother, John, although at least one subsequent report stated that J.Z.-V.'s paternal uncle may have also resided in the home.[3]

On July 11, 2023, E.Z.-V. took J.Z.-V. to University Hospital after observing that he appeared to be experiencing pain in his leg.  She reported that J.Z.-V. had been experiencing pain for several days when she touched his left

---

[2]  Before us, J.A. does not challenge the court's fact-finding of abuse or neglect.

[3]  Given that the siblings share the same initials, we adopt the name "John" as a pseudonym to protect the confidentiality of the victim.  See R. 1:38-3(d)(10) to (12).

leg, was unaware of any fall or other cause of the injury, and delayed seeking medical attention because she "did not have any days off."[4]

After evaluating J.Z.-V., hospital staff obtained imaging of his left leg. The X-ray revealed what was described as "a concerning metaphyseal chip fracture at the distal end of the tibia." Hospital records further noted that, "[g]iven [the] concerning pattern of fracture in a non[-]ambulatory child . . . concern for non[-]accidental trauma is high." Medical imaging revealed no fractures other than the left tibial injury. The July 12 skeletal survey "did not reveal any other fractures," and a repeat skeletal survey performed on August 1, 2023 showed "no old or new fractures." Orthopedic specialists were consulted, a cast was applied, a skeletal survey was ordered, and the Division was notified.

The Division commenced an investigation into the circumstances surrounding J.Z.-V.'s injuries on July 12, 2023, during which E.Z.-V. gave several, and often conflicting, accounts regarding the timing and means of the injury itself.[5] E.Z.-V. initially reported that, after picking J.Z.-V. up from the

---

[4]  The record before us contains various contradictory statements from the infant's parents throughout the Division's investigation and the ensuing litigation concerning both the timing and the cause of the infant's injury.

[5]  The Division had prior contact with the family in 2023 based on allegations concerning the older child and allegations of domestic violence in the home, but a later investigation determined the allegations against J.A. to be unfounded.

babysitter on July 11, she changed his diaper, noticed he appeared sensitive when she touched his ankle, and took him to University Hospital. She further stated that J.Z.-V. stayed with the babysitter seven days a week, from approximately 10:00 a.m. to 5:00 p.m., while she worked, and may have been injured at the babysitter's home. She also reported to Division investigators that J.Z.-V. may have been injured while she was carrying him up the stairs along with a stroller and bags. Later that day, during questioning at the Special Victims Unit, E.Z.-V. reportedly said J.Z.-V. "fell Saturday (July 8th) and landed hard on the floor, which could have caused the fracture." She also changed her account of who retrieved J.Z.-V. from the babysitter, ultimately stating that J.A. picked him up because she was delayed at work.

Investigators also interviewed John, who initially reported that J.Z.-V. was in good condition before E.Z.-V. took him to the hospital and stated that he knew "there was nothing wrong with [J.Z.-V.] because the day of the incident, [J.Z.-V.'s] foot was straight, and [J.Z.-V.] was not fussing." He also reported that E.Z.-V. called him that evening and that after seeing J.Z.-V. following the pickup from the babysitter, he later observed that J.Z.-V.'s foot was "not straight." As characterized by the Metropolitan Regional Diagnostic and

A-3805-24

Treatment Center (Metro RDTC) report, E.Z.-V. "made conflicting statements regarding who lived in the home with [J.Z.-V.]."

The babysitter provided a different account, in which she told investigators that J.Z.-V. was fine when he arrived on July 11, had no issues with his legs or feet, and was picked up by J.A. Later, at the fact-finding hearing, the babysitter testified J.Z.-V. was dropped off by E.Z.-V. at approximately 11:00 a.m. in "perfect condition," that she changed his diaper "about two or three times," observed nothing abnormal, and that nothing happened to him while in her care. She also added that E.Z.-V. reported no issues with the infant when she dropped him off to suggest he was ill or injured. She further testified J.Z.-V. was awake, "in good condition," and "wasn't crying" when J.A. picked him up.

J.A.'s July 12 statement to Division investigators placed J.Z.-V. in his sole care between pickup from the babysitter and E.Z.-V.'s return home. J.A. stated that J.Z.-V. was "okay" when he left the babysitter's home, that he walked home with him in the carrier, and that he later noticed J.Z.-V.'s foot was "not straight" and appeared swollen.

Following the Division's investigation and filing of a Verified Complaint for Care and Supervision of J.Z.-V. and John, a three-day fact-finding hearing

6

ensued. The Division presented the testimony of Dr. Monica Weiner, J.Z.-V.'s babysitter and a Division permanency worker. J.A. testified and presented the testimony of Dr. Jack Levenbrown. E.Z.-V. did not testify.[6] The Office of the Law Guardian appeared on behalf of John and J.Z.-V.

The State's Expert

Dr. Weiner, a child abuse physician, authored the Metro RDTC report and testified that J.Z.-V. had no documented condition that would predispose him to fractures and explained that although the injury had been described as both a metaphyseal corner fracture and a buckle fracture, it nevertheless required trauma. She opined that in a six-month-old non-mobile infant, "somebody should know what happened to him to fracture . . . his leg." Based upon the medical evidence and caregiver history, she concluded the injury occurred "between the time [J.Z.-V.] was picked up from the babysitter and the time that his mother got home," and because the fracture remained unexplained, "physical abuse has to be considered the cause."

---

[6] In his brief, J.A. stated that "[r]egardless of what [E.Z.-V.] testimony would have been, even if she testified that [J.Z.-V.] was hurt three days beforehand, she would be confronted with prior inconsistent statements damaging her credibility. Her testimony would not have affected the outcome of the trial."

Dr. Weiner testified consistent with her Metro RDTC report and reached the same conclusion, stating J.Z.-V.'s leg "was fractured between the time [J.A.] picked him up and the time [J.Z.-V.] arrived home" and that the injury "should be considered to be the result of physical abuse."

The Defense's Expert

The defense presented the testimony of Dr. Levenbrown, a board-certified doctor of pediatrics and radiology, who disagreed with Dr. Weiner's opinion as to the cause of the infant's injury. During his testimony, Dr. Levenbrown sought to use a chart he prepared to explain his theory of the different fractures in pediatric case, and ultimately the cause of J.Z.-V.'s injury. The Division argued the chart had only been provided the day prior to the expert's testimony, after they had rested their case, and was not mentioned in Dr. Levenbrown's report.

Defense counsel sought to explain to the court that she had only just received the subject chart from Dr. Levenbrown on the prior day and that she had no objection if the Division wanted to recall their expert as a rebuttal witness and her "intentions were not to enter it into evidence, just simply as an opportunity to mark it for identification for . . . Dr. Levenbrown to testify or to assist him in his testimony."

The court declined to permit the use of the chart as demonstrative evidence but allowed Dr. Levenbrown to testify the injury was an "acute, diagonal, non-displaced fracture involving the medial aspect of the distal tibial metaphysis," rather than a classic metaphyseal lesion. He further opined that "[i]t is highly likely that the isolated, single minor fracture of the lower left tibia was due to an accidental injury in this [six-month-old], and was NOT an inflicted injury." (Emphasis in original). Consistent with that opinion, he testified the fracture reflected an impact injury, with "a fall being the most likely reason," and was not the type of injury caused by yanking or twisting. The court also admitted his report and the attached X-rays into evidence.

The Court's Decision Following the Fact-Finding Hearing

Following the testimonial phase of the hearing and receipt of written post-trial submissions from the parties, the court issued an oral decision accompanied by a written order, dated September 20, 2024. The court found by a preponderance of the evidence that J.A. abused or neglected his son by causing the infant to sustain a fracture by force under N.J.S.A. 9:6-8.21(c)(1). The court relied on the babysitter's testimony that the child was not injured when he was dropped off and considered the time the family arrived at the hospital to

9

determine that J.A. was the sole caregiver at the time of the injury, which occurred between these events.

The court credited Dr. Weiner's opinion as "persuasive and supported by the medical evidence," found the babysitter credible, rejected Dr. Levenbrown's opinion as "partially based on facts that the [c]ourt does not accept," and declined to credit E.Z.-V.'s statement that J.Z.-V. had fallen several days earlier.

The litigation remained open until June 18, 2025, when the court entered the order terminating litigation after finding J.A. had successfully completed psychotherapy, anger-management and domestic-violence counseling, and parenting services, and the Division had no concerns regarding the children's care and protection.

This appeal followed, limited to J.A.'s claim that he was denied the effective assistance of counsel at the fact-finding hearing. J.A. also sought to supplement the record supporting his claims of ineffective assistance of counsel and included a certification of Dr. Levenbrown. In his certification, Dr. Levenbrown reiterated his disagreement with the Division's expert's opinion "the injury the child suffered was a buckle fracture," as the injury he observed did not conform with what would be seen for a pediatric buckle fracture. Additionally, he challenged the court's denial of his use of the demonstrative

A-3805-24

chart during the hearing and explained that the visual aid was created to show the "the subject child's X-ray next to examples of either the same type of injury as [he] diagnosed or the type of injury described by [the Division's] expert," essentially arguing the chart was necessary because of the difficult nature of explaining these concepts to a layperson.

In its amplification filed pursuant to Rule 2:5-1(d), the court emphasized that J.A.'s admission that E.Z.-V. was not home when he first observed the injury "further supports the court's finding that the non-accidental injury occurred while the child was in [J.A.]'s care." The court stated, "[d]uring the Division's investigation, [J.A.] acknowledged that on the day in question he picked the child up from the babysitter and took him home. He also admitted that [E.Z.-V.] was not home at the time that he noticed the injury." The court therefore concluded that this admission "further supported its finding that the non-accidental injury occurred while the child was in [J.A.]'s care."

Before us, J.A. raises the following single point for our consideration:

POINT I

Ineffective Assistance of Counsel Impaired Crucial Issues in this Case. (Issue Not Raised Below).

A.    Appointed Trial Counsel's Lack of Preparation and Unreasonable Professional [Judgment]

11

Deprived [J.A.] of Competent Counsel for the Fact-Finding. (Issue Not Raised Below).

B.      There is a Reasonable Probability Counsel's Lack of Preparation Altered the Trial Outcome. (Issue Not Raised Below).

## II.

"[B]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "Moreover, appellate courts 'defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a feel of the case that can never be realized by a review of the cold record.'" Id. at 342-43 (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). Thus, "[f]indings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence." Pascale v. Pascale, 113 N.J. 20, 33 (1988) (alteration in original) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)).

We address J.A.'s claim because it raises constitutional issues that could not have been raised below, as "the right to counsel in a termination case has

12                                                          A-3805-24

constitutional as well as statutory bases. . . . [T]he performance of [] counsel must be effective" N.J. Div. of Youth & Fam. Servs. v. B.R., 192 N.J. 301, 306 (2007). Moreover, the right to counsel is grounded in the constitutional guarantee that a litigant receive fundamentally fair proceeding and necessarily includes the right to the effective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 685-86 (1984) (explaining that the right to counsel is the right to the effective assistance of counsel because counsel plays a role critical to the ability of the adversarial system to produce just results); B.R., 192 N.J. at 306-09.

In B.R., our Supreme Court held that parents facing proceedings that threaten their fundamental parental rights are entitled to the effective assistance of counsel and adopted the two-pronged Strickland standard for evaluating such claims. Ibid.

A defendant who raises an ineffective assistance of counsel claim in a Title Nine matter, must fulfill both prongs of the test outlined in Strickland:

> (1) counsel's performance must be objectively deficient—i.e., it must fall outside the broad range of professionally acceptable performance; and

> (2) counsel's deficient performance must prejudice the defense—i.e., there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

[B.R., 192 N.J. at 307 (quoting Strickland, 466 U.S. at 694).]

The first prong requires a litigant to "demonstrate that the attorney's actions 'were beyond the wide range of professionally competent assistance.'" N.J. Div. of Youth & Fam. Servs. v. B.H., 391 N.J. Super. 322, 347 (App. Div. 2007) (internal quotation marks omitted) (quoting State v. Savage, 120 N.J. 594, 614 (1990)).  Regarding the second prong, a "reasonable probability" that the results of the matter would have been different means a "probability sufficient to undermine confidence in the outcome." B.H., 391 N.J. Super. at 348 (quoting Strickland, 466 U.S. at 694).  "[I]n order to establish a prima facie claim, a petitioner must do more than make bald assertions that he was denied the effective assistance of counsel." State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999).  A petitioner "must allege facts sufficient to demonstrate counsel's alleged substandard performance." Ibid.

III.

Guided by these well-settled legal principles, we reject J.A.'s ineffective-assistance-of-counsel claim.  J.A. principally argues that trial counsel's alleged lack of preparation and unreasonable professional judgment deprived him of a fair fact-finding hearing.  More particularly, J.A. argues "[a]ppointed counsel failed to introduce crucial evidence in a timely manner . . . and should have

14

known that her last-minute attempt to introduce [a] critical document would fail," referring to defense counsel's belated attempt to introduce a chart prepared by Dr. Levenbrown comparing J.Z.-V.'s X-rays to other, unrelated children during the fact-finding hearing.[7] At the time, counsel explained to the court that she had only just received the chart from Dr. Levenbrown and that she had no objection if the State wanted to recall its own expert as a rebuttal witness. Counsel further explained that she sought only to mark the chart for identification to assist Dr. Levenbrown as he testified, and did not intend to move the chart into evidence.

The court, however, did not permit the chart to be used. J.A. maintains his "counsel's excuse for her last-minute attempt to enter this crucial evidence is unavailing." Based on the court's determination following the fact-finding hearing, J.A. maintains the court "discounted the testimony of Dr. Levenbrown[,] stating that he had 'opined that the injury was accidental, with no credible evidence to support the opinion.'" He posits that there is a "reasonable probability that, absent counsel's error, the [court] would have the

---

[7] Although Dr. Levenbrown's chart was not admitted into evidence, both parties describe it as a demonstrative exhibit comparing J.Z.-V.'s X-ray with example X-rays depicting various types of pediatric fractures.

credible evidence it needed to support Dr. Levenbrown's opinion," as to the cause of J.Z.-V.'s fracture.

In addressing this point, the Law Guardian emphasizes the lack of clarity with respect to the contents of Dr. Levenbrown's chart and the timing in which it was given to defense counsel, noting that "counsel cannot be held responsible for exhibits that she did not know the expert wanted to use, thus, the presumption that defense counsel acted reasonably has not been overcome." Similarly, the State maintains "[J.A.] cannot demonstrate that his counsel should have been aware of the demonstrative evidence with which she was not provided." Additionally, the State points to Dr. Levenbrown's own testimony where he stated that he typically attaches samples X-rays to his report, which were absent in this case, and emphasizes that "[g]laringly absent from his certification on appeal is any claim that he provided the demonstrative X-rays to [J.Z.-V.]'s counsel before trial."

Based on this record, we are not convinced that counsel's failure to timely serve the demonstrative chart on the Division, or his belated attempt to use it as a demonstrative aid at the hearing, constituted objectively deficient representation. "A defendant is entitled to a fair trial, but not a perfect one." State v. Wakefield, 190 N.J. 397, 537 (2007). Thus, to succeed on his claim,

J.A. must show that both counsel's performance was objectively unreasonable and the deficiency prejudiced the outcome. See B.R., 192 N.J. at 307. The Strickland standard is "highly deferential," and requires us to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.

Here, the record does not support J.A.'s claims. Rather, the record suggests that Dr. Levenbrown did not include the demonstrative chart with his report and later provided it in connection with his trial testimony, prompting defense counsel to explain the late disclosure and represent to the court that she would not object to the Division recalling its expert to address the chart's evidentiary significance. In any case, we are hard-pressed to conclude that counsel's oral application to the court to admit the chart for identification, which was denied, is indicative of constitutionally deficient representation as required under Strickland's first prong. The court permitted Dr. Levenbrown to testify regarding his qualifications and conclusions and admitted his written report and J.Z.-V.'s X-rays into evidence. Dr. Levenbrown explained that the injury was an "acute, diagonal, non-displaced fracture," which was "highly likely" accidental and "NOT an inflicted injury," and that it was not the type of injury caused by yanking or twisting. (Emphasis in original). Thus, although it was

17

ultimately rejected, the defense's theory was fully presented to the court even without the use of the demonstrative chart. Critically, the court did not reject Dr. Levenbrown's opinion because the demonstrative exhibits were excluded. Instead, it found Dr. Weiner's testimony more persuasive as to causation, relied on the babysitter's testimony regarding J.Z.-V.'s condition at drop-off and pick-up, and J.A.'s own admissions regarding his interactions with J.Z.-V. to conclude the injury occurred while J.A. was the infant's sole caregiver.

The court credited the babysitter's testimony that J.Z.-V. arrived in "perfect condition," exhibited no signs of injury while in her care, and was awake, "in good condition," and "wasn't crying" when J.A. picked him up. The court also credited Dr. Weiner's testimony that the fracture required trauma and occurred during the period between J.Z.-V.'s pickup from the babysitter and E.Z.-V.'s return home. J.A.'s own statement placed the child exclusively in his care during that interval and acknowledged he was the first person to notice the child's foot was "not straight" and swollen. Although the record contains confusing and at times contradictory accounts, the court resolved those conflicts by relying on the testimony it found credible and believable after observing the witnesses and by rejecting factual assumptions it found unsupported. The court likewise explained why it rejected the competing accidental-injury theory.

A-3805-24

Those credibility determinations are supported by the record and entitled to our deference.  See Cesare, 154 N.J. at 412-13.

Additionally, we are not convinced that any alleged error by counsel prejudiced J.A. such that the outcome of the fact-finding hearing would have been different as required under Strickland's prejudice prong.  Accordingly, J.A. has failed to establish ineffective assistance of counsel, and we discern no basis to disturb either the September 2024 or June 2025 orders.

To the extent that we have not addressed all of J.A.'s ancillary arguments, we conclude that they are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Hanley*

Clerk of the Appellate Division

A-3805-24